## BOWEN *v.* CHASE.

1. The court adheres to its ruling in *Bowen* v. *Chase* (94 U. S. 812), touching the title to certain lands whereof Stephen Jumel was sometime the owner, which were conveyed upon certain trusts to the separate use of Eliza Brown Jumel, his wife, with a general power of appointment during her lifetime, and of the several appointments made thereunder to Mary Jumel Bownes by said Eliza, who survived her husband, which ruling declares that the title to the property situate in New York City passed on her death to said Mary in fee, except a tract of sixty-five acres on Harlem Heights, in regard to which no opinion was expressed.

2. Bowen, claiming to be the heir-at-law of said Eliza, brought ejectment for all the lands against the heirs-at-law of said Mary who were in possession of them, but offered no evidence that said Stephen had transferred the title of said tract, or that said Eliza had ever acquired any interest therein except her estate in dower. The conveyances made by said Eliza to defeat her appointments in favor of said Mary and restore the lands to their original trusts were put in evidence. They recite that the said tract had been originally conveyed upon the same trusts as the remaining lands. The defendants then offered to prove declarations of said Stephen, while residing on and having the seisin and control of said tract, that his wife had sold all the property out of his hands, under a power of attorney given not to dispossess him, but to do business for him; that they had compromised a settlement by which the estate owed him a support for life, and at his death and that of his wife it was to go to their daughter, and he was satisfied. *Held*, that such declarations being in harmony with the deeds that he had executed or authorized, and against his interest in reference to the property not conveyed, or not shown to have been conveyed, were admissible.

3. After the evidence was closed, counsel on both sides agreed that as to the title of said Mary there was no conflict of testimony, and that it was a matter for the court to determine. The court thereupon directed the jury to find specially that said Eliza, "at the time of her death, had no estate or interest in the lands claimed which was descendible to her heirs." *Held*, that if the parties meant that the court should determine whether, as a matter of fact, she had or had not such estate or interest, the direction was in the nature of a finding made at their request, which this court cannot review; that if the title was to be determined as a matter of law, they must have intended that the declarations of said Stephen were to be received as true, and, if so, the direction was proper.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. Chauncey Shaffer* and *Mr. Merritt E. Sawyer* for the plaintiff in error.

*Mr. James C. Carter, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case was before us in an equity suit at the October Term, 1876, upon the same general state of facts which is embodied in the present record. *Bowen* v. *Chase*, 94 U. S. 812. The bill in that case was filed after the commencement of this, for the purpose of enjoining this and all other suits brought by the plaintiff in error for the property involved in the controversy. The Circuit Court had decreed a perpetual injunction in reference to the whole property. We sustained that decree as to all the property in New York City except a tract of sixty-five acres on Harlem Heights, as to which it did not seem to us that an injunction was proper. Consequently, the present suit, which was on our docket at the time, on writ of error, was continued for argument.

The case was tried by jury in the Circuit Court, in October Term, 1872, and certain errors are alleged as to the admission and rejection of testimony, and as to the charge of the court. In order to understand their bearing, it is necessary to take a general view of the facts of the case, as they are spread upon the record in the bill of exceptions.

The action is ejectment brought to recover possession of various parcels of real estate in the city of New York; viz., *first*, a certain tract of ninety-four acres, situated on Harlem Heights, divided into lots numbered 6, 7, 9, 10, 11, 12, 13, 14, and 15, according to a map of the estate of Leonard Parkinson, made by Charles Loss in 1810; *second*, a lot of thirty-two acres at Harlem Heights, known as the homestead, being part of lot numbered 8 on said map; *third*, two houses and lots on Seventh Avenue and 41st Street, the claim to which was abandoned by the plaintiff on the trial; and, *fourth*, two lots at the corner of Broadway and Liberty Streets.

This property was all in possession of one Eliza B. Jumel, known as Madame Jumel, widow of Stephen Jumel, at the time of her decease in July, 1865; and has ever since been in the possession of the defendants, Nelson Chase, and his chil-

dren by his wife Mary Jumel Bownes (or, as she was called, Mary Jumel), an adopted daughter of Mr. and Madame Jumel, who died in 1843. Their claim to the property is based on a family settlement made in 1828, whereby a life-estate was secured to Madame Jumel, with a remainder to Stephen Jumel for life, remainder in fee to the said Mary Jumel Bownes, their adopted daughter. In 1867, the present suit was brought for the recovery of the property by George W. Bowen, the plaintiff in error, who claims to be an illegitimate son of Madame Jumel, born in Providence in 1794, and as such her heir-at-law under a statute of the State of New York passed in 1855, by which illegitimate children, in default of lawful issue, are made capable of inheriting from their mother. He contends that Madame Jumel died seised of a descendible estate in the property, and that he, as lawful heir, is entitled to the possession of it. The defendants, on the trial, contested both allegations; viz., that the plaintiff was the son of Madame Jumel, and that she died seised of a descendible estate. Other issues were raised by the defence, which it is unnecessary now to notice.

Much of the evidence taken at the trial related to the question of the plaintiff's alleged relationship to Madame Jumel, and most of the errors assigned relate to rulings on the admission and rejection of testimony on that subject. As this branch of the case becomes immaterial, if it be shown (as found by the jury) that Madame Jumel had no descendible estate in the property, we will consider the latter question first.

The marriage of Stephen and Madame Jumel took place in New York in April, 1804; and the adoption of Mary Jumel Bownes, who was a niece of Madame Jumel, took place soon after, when the said Mary was a mere child. Mr. Jumel was a French wine-merchant of considerable wealth, residing in New York, and after his marriage with Madame Jumel they lived in much style for that day in the lower part of the city.

It is conceded that the property in question all belonged to Stephen Jumel. It is so stated in the briefs of both parties, and the conveyances by which Stephen Jumel acquired the different parcels were exhibited in proof on the trial. The tract called the homestead was occupied as a country seat.

The tract of sixty-five acres, which is the only one now in question, was an out-lot in the vicinity, partly covered with wood, and was part of the ninety-four acre tract at Harlem Heights first described in the complaint. This tract of sixty-five acres, with another of thirty-nine acres, was conveyed to Stephen Jumel by one Leonard B. Parkinson, by deed bearing date March 9, 1810, a certified copy of which was put in evidence without objection.

It is not pretended that Stephen Jumel parted with the title to any of the property until about the year 1825 or 1827. At or about the latter period arrangements were made by him, or under his authority, out of which arises the controversy respecting the extent of Madame Jumel's interest, and which formed the subject of examination, and the ground of decision in the equity suit. The defendants insist that they are equally decisive in this.

It appears from the evidence that in 1815 the family, consisting of Mr. Jumel and his wife and their adopted daughter, went to France. Madame Jumel returned in the spring of 1817; but her husband and adopted daughter remained for some period longer, the latter being placed at school. The daughter returned after three or four years, and in 1821 she and Madame Jumel again went to France, and remained there for several years. The documents in the case show that Madame Jumel was still in Paris as late as the spring of 1826, residing with her husband in the Place Vendome. She returned to this country in that or the following year. When in this country she usually resided at the family mansion or homestead on Harlem Heights. Stephen Jumel returned in the summer of 1828, and resided with his family at the mansion-house until his death on the 22d of May, 1832.

The history of the property in question during this period, so far as the documentary evidence shows, is substantially as follows : —

In January, 1815, before the family left for France, Mr. Jumel conveyed the homestead on Harlem Heights, then consisting of thirty-six acres, to a trustee for the life of Madame Jumel, to hold the same in trust for himself during his own life, and after his death for the benefit of Madame Jumel.

during her life, and then to convey the property back to Mr. Jumel and his heirs. Nothing further seems to have been done in this direction until Madame Jumel's last visit to France. Whilst she was there, a second settlement was made of the homestead, by a deed dated in January, 1825, whereby it was conveyed to new trustees, for the separate use and benefit of Madame Jumel in fee. About a year later, in January, 1826, Mr. Jumel conveyed the Liberty Street property to a trustee, for the benefit of his wife during her life, subject to a mortgage of $6,000. On the 15th of May, 1826, probably about the time of her leaving for this country, he gave her a general power of attorney, under and by virtue of which several conveyances were subsequently made in his name. By this power he made his wife his attorney to transact and manage his affairs at New York, or at any place in the State of New York, and in his name and for his use and behalf to sell and convey all or any part of his real estate, and to receive the moneys arising from such sales, and give acquittances for the same.

By virtue of this power, various conveyances were made by Madame Jumel in 1827, by which all the property before referred to, except the sixty-five acres now in question, was conveyed in fee-simple absolute to Mary Jumel Bownes, the adopted daughter of Mr. and Madame Jumel. These conveyances purport to be sales for valuable consideration expressed therein. Two of them are dated on the thirtieth day of July, 1827, one for the twenty-nine acre lot, No. 6, part of the ninety-four acre lot, and the other for the thirty-nine acre lot, No. 5; and a third conveyance was executed for the Liberty Street property on the 24th of November, 1827. A fourth conveyance, of the homestead, thirty-six acres, was made on the 1st of January, 1828. Where the property had been conveyed to trustees, they joined in the conveyances.

After the first three conveyances had been made to her, Mary Jumel Bownes, in December, 1827, conveyed the property therein named to one Michael Werckmeister, in trust; and in May, 1828, she conveyed to him the homestead, also in trust. The trust declared in each case was to the effect, first, that the trustee should, during the lifetime of Madame Jumel,

receive the rents and profits and pay them over to her, or at her option permit her to use, occupy, and enjoy the property and receive the rents and profits thereof; secondly, that he should lease, sell, convey, and dispose of the property as Madame Jumel should by writing, executed in the presence of two credible witnesses, order, direct, limit, or appoint, and in case of an absolute sale, to pay to her the purchase-money, or invest it as she should order and direct; thirdly, upon her decease, to convey to her heirs-at-law such of the property as should not have been previously conveyed, and with respect to which no appointment should have been made by Madame Jumel in her lifetime.

The above conveyances to Mary Jumel Bownes, and the deeds of trust made by her to Werckmeister, were all executed before Mr. Jumel's return to this country. On the 21st of November, 1828, after his return, Madame Jumel executed the power of appointment given to her in the trust-deeds. By this instrument, after reciting the trusts, she directed as follows: —

"Now I, the said Eliza Brown Jumel, do hereby order, direct, limit, and appoint, that immediately after my decease the said Michael Werckmeister, or his heirs, convey all and singular the said above-described premises to such person or persons and to such uses and purposes as I, the said Eliza Brown Jumel, shall, by my last will and testament, under my hand and executed in the presence of two or more witnesses, designate and appoint, and for want thereof, then that he convey the same to my husband, Stephen Jumel, in case he be living, for and during his natural life, subject to an annuity to be charged thereon, during his said natural life, of $600, payable to Mary Jumel Bownes, and after the death of my said husband, or in case he shall not survive me, then, immediately after my own death, to her, the said Mary Jumel Bownes, and her heirs in fee."

Thus the matter stood until after Mr. Jumel's death, and after the marriage of Madame Jumel to Aaron Burr, when in 1834, and again in 1842, she made ineffectual attempts (in the equity case we held them to be ineffectual) to defeat the appointment she had made in favor of Mary Jumel Bownes (then the wife of Mr. Chase), and to settle the property absolutely upon herself.

The effect of the different conveyances, including the appointment by Madame Jumel, as determined by us in the equity case, and as we still hold, was to create an estate to the use of Madame Jumel for life, with a power of appointment by deed or will; and with remainder on failure of such appointment to the use of Stephen Jumel for life, with a final remainder to Mary Jumel Bownes in fee. We further held, that whilst, by the terms and legal effect of this settlement, Madame Jumel had power to revoke her appointment in favor of Mary Jumel Bownes for the purpose of making a *bona fide* sale of the property, she could not revoke it for the purpose of substituting another voluntary appointment.

It is evident that the arrangement as finally settled had the approbation of Mr. Jumel. The deeds executed in 1827 may have caused him some anxiety, and may have hastened his return to New York; but the appointment made by Mrs. Jumel after his return evidently had his sanction and approbation. He seems, from the testimony, to have had a sincere attachment to his adopted daughter. The terms on which the family lived during the latter years of his life, as well as after that time, are shown in the testimony of the defendant, Nelson Chase. He says: " I knew Stephen Jumel; was living at his house, and was one of his family when he died. He left no child or relation, to my knowledge, in this country. He was a Frenchman. I married one of his family. I married Mary Jumel Bownes, who was a niece of Madame's; was married on the 15th of January, 1832, at Judge Crippen's residence, in Worcester, Otsego County. My first knowledge of Madame Jumel was while I was studying law with Judge Crippen, in July, 1831. Madame came to Worcester, where I was, to see Judge Crippen, bringing with her a young lady, whom she introduced as her niece. My acquaintance with the young lady continued some time, and until Madame Jumel said to me, I perceive there is a friendship between you and my niece Miss Mary; she added, if I and Mary could agree, she would be happy to have me for a son-in-law; that if we got married she would expect us to come and live with herself and her husband on their place; she said that Mary was her adopted daughter, and was to be her heir. Mr. Jumel died May 22,

1832. This lady whom I married died May 5, 1843. Two children of the marriage are living : one daughter, Mrs. Eliza Jumel Perry, was born at the mansion March 25, 1836 ; one son, William Inglis Chase, was born Aug. 17, 1840. I and my family, and my daughter and her family, and my son and his family, all live in the Jumel mansion, and we have all lived there ever since Madame Jumel's death. My wife returned to the mansion in February next after our marriage, and I followed in the next month, and from that time until the death of Mr. and Madame Jumel I and mine substantially lived with them as one family."

We have been thus explicit in setting forth the history of the Jumel family, and of the property in dispute, as exhibited by the evidence in the case, because of its bearing upon certain evidence about to be noticed, and upon the final disposition of the cause by the court and jury.

On the trial, the defendants contended that, although no deeds or conveyances for that purpose could be found, yet that, in fact, the sixty-five acre tract had passed through the same course of settlement as the rest of the property had done. To show this, they offered to prove by one John Caryl, who had lived in service with the family for several years, a certain statement and declaration made by Stephen Jumel to the witness in the fall or winter of 1828, whilst Madame Jumel and her daughter were on a visit to the South. They put to the witness this question : —

" At that time, did Mr. Jumel make any statement to you as to the ownership of the property whilst he was thus residing on the premises and you were there working on them under him ? "

The question was objected to by the plaintiff's counsel, but the objection was overruled and an exception taken.

The witness testified as follows : —

" After Madame Jumel and Mary went south, and while I was living on the place with Mr. Jumel, he stated to me that he had given Madame a power of attorney, not for the purpose that she should dispossess him or disinherit him, but in order that she should do business for him. He said that she sold all the property out of his hands under the power of attorney, and he had nothing left he could call his own ; but he said that they

had had a compromise or settlement, by which the estate owed him a support as long as he lived, and in the end, at his decease and Madame's, it was to go to Mary, and with that he was satisfied. In the first place, when he said the property had been sold from under him, I said, 'Mr. Jumel, I knew that fact. It was done in 1827, last year.' He then made other remarks, which I have stated. On another occasion, either Christmas-day, 1828, or New Year's, 1829, he stated to my father in my hearing that the property was sold out of his hands, but that Madame had made a settlement, or something to that effect, whereby they were to enjoy the property while they lived, and that in the end it was to go to Mary, and with that he was satisfied."

One of the errors assigned by the plaintiff is, the admission of this testimony. As it has an important bearing upon what followed in the disposition of the cause, it is necessary to examine the question raised by this exception. The plaintiff contends that the declarations of Stephen Jumel at that time were not competent evidence in the cause: that they were not against his interest ; that he was not in possession of the property ; that they were not contemporaneous with the acts to which they refer; and, if otherwise admissible, they could only be used as evidence against himself, or his privies in blood or estate. But what were the clear facts of the case as they then stood upon the evidence ? The entire property in question had originally belonged to Stephen Jumel. By himself, or by his family, his servants in charge, or his tenants, he had the undisputed possession of the whole of it, at least down to 1825. Their possession was his possession. They had no pretence of possession except through or under him. The homestead had been conveyed by him in 1815 to trustees, for the benefit of himself for life, and after his death for the benefit of his wife for life. Her interest in it was subordinate to his. In 1825, he made another conveyance of the homestead to trustees, for the separate use of his wife in fee. She never had any possession, even of this parcel, except through and under him by a voluntary conveyance on his part. In 1826, he conveyed the Liberty Street property to trustees, for the separate use of his wife for life, remainder to himself and his heirs

in fee. All the rest of the property remained in his actual or constructive possession until the conveyances made by virtue of his power of attorney in 1827. These conveyances were all voluntary on his part; and whatever he may have thought or believed, he retained the power of defeating them at any time by a sale to a *bona fide* purchaser. He returned home in 1828, and resided with his family on the property which he had thus voluntarily subjected to their use. One tract, the sixty-five acre lot now in question, so far as any evidence had yet appeared in the cause, still remained absolutely in him. It stood as it had always stood, in his possession, seisin, and control. Surely as to this tract, if not as to the others, he was in a position in which his declarations were admissible. It is unnecessary to refer to authorities on this subject. They are discussed in 1 Greenl. Evid., sect. 109, and in 2 Taylor, Evid., sect. 617. Declarations contrary to the tenor of the deeds or documents which he had executed or authorized would not be admissible, it is true; but declarations in entire harmony therewith, and against his interest in reference to property not conveyed, or not shown to have been conveyed, were clearly admissible. The statement testified to by Caryl was of this sort; and according to this statement, the entire property had been settled so as to go to his adopted daughter in the end. There was no conflict of evidence on this subject. On the contrary, the conveyances which Madame Jumel procured to be made, after Mr. Jumel's death, to Hamilton and Philleppon, for the purpose of defeating her own appointment made in 1828, recited the fact that the sixty-five acre tract, as well as the others, had been conveyed by Mary Jumel Bownes to Werckmeister upon the same trusts as those were. The plaintiff put these deeds in evidence, and they corroborate Mr. Jumel's statement. The recitals in those deeds cannot be used against the defendants, it is true ; but, as far as they go, they are corroborations, on the plaintiff's part, of the statement referred to.

We think the evidence was admissible, and that there was no error in receiving it.

This evidence serves to explain what took place at the close of the trial in giving the case to the jury.

After the evidence was closed, the bill of exceptions proceeds to state what occurred, as follows: " The plaintiff made no claim for the lands on Seventh Avenue, mentioned in the declaration. As to all the other lands mentioned in the declaration, the defendant's counsel insisted that, on the undisputed facts in evidence, the defendant, as a matter of law, was entitled to a verdict, even if the jury should believe that the plaintiff was the heir-at-law of Eliza B. Jumel. The counsel on both sides agreed that, on this branch of the defence, there was no conflict of evidence, and that it was a matter for the court to determine."

The presiding judge then proceeded to charge the said jury, and after giving them directions as to the other issues in the cause, on the subject in question he directed them to find specially " that Eliza B. Jumel, at the time of her death, had no estate or interest in the lands claimed, which was descendible to her heirs." To this charge the plaintiff excepted, and it is assigned for error here.

Now if we lay out of view the declarations of Mr. Jumel, above referred to, there was not a particle of evidence in the case to show, as against the defendants, that the sixty-five acre lot had ever been conveyed by Mr. Jumel, or that Madame Jumel had ever acquired any interest therein, except her estate in dower as his widow. There is no evidence of any adverse possession by her under any other claim of title than that which she asserted to the rest of the property. If, therefore, the declarations of Mr. Jumel are to be laid out of view entirely, the charge of the judge was clearly right.

The evidence, however, was admitted, and went to the court and the jury together with the other evidence in the case respecting Madame Jumel's title to the land in question ; and both parties agreed that, on this branch of the defence, there was no conflict of evidence, and that it was a matter for the court to determine. Now they either meant to leave it to the judge, or the whole evidence in the case, including the declarations of Mr. Jumel, as well as the conveyances which were produced, to determine the matter as a question of fact, whether Madame Jumel, at the time of her death, had or had not any descendible interest in the property, or they meant to leave it to him as a question of law, whether upon the whole evidence as it

stood (in which they admitted there was no conflict) she had any such descendible interest. If they meant the former, the judge did determine the question in the only manner in which, by the New York practice, he could do so, — by directing the jury to find that she had not such interest. In this view of the case, the decision of the judge, though given by way of a peremptory direction to the jury, was in the nature of a finding of fact made at the request of the parties, which we cannot review, any more than we could review the finding of a jury on a question of fact fairly submitted to them.

But if the parties meant to leave the question to the determination of the judge as matter of law, assuming that the declarations of Mr. Jumel were to be received as true (which must have been what they intended when they agreed that there was. no conflict in the evidence on that branch of the defence), then we are still of opinion that the decision was right. If it was true, as stated by Jumel, that, under the power of attorney made by him, his wife had sold all the property, but that they had had a compromise or settlement, by which the estate owed him a support as long as he lived, and in the end, at his decease and Madame's, it was to go to Mary, — if that statement was true, how could the judge have decided otherwise than he did? That language in a will, or any other document, could never be construed to give Madame Jumel a descendible interest. It is in exact conformity with the known facts of the case as evinced by the documents themselves, so far as the documents go.

But there is another aspect of the case as to what the parties meant in their conference with the court, which leads to the same conclusion. It is to be remembered that at the trial of the cause the entire property was in controversy, and as to most of the parcels there was no question as to the deeds and conveyances which had passed. The parties undoubtedly desired the opinion of the court upon the legal effect of these conveyances, and it is quite apparent (though not expressly so stated) that when both sides made the concession or agreement referred to, and requested the court to determine the question, they assumed, or intended to assume, that all the property had been limited upon the like trusts and appointment. If this was so, the decision called for from the judge

was really as to the effect of the trust-deed executed to Werck-meister, and of the several appointments made thereunder by Madame Jumel. As in this view of the matter the decision was in conformity with the views of this court in the former case, we hold it to be correct.

In every aspect, therefore, in which this branch of the case may be viewed, we think that no error was committed by the court below.

The disposal of this question determines the cause. The other errors assigned become entirely immaterial, if Madame Jumel had no descendible interest in the property for the plaintiff to inherit.

*Judgment affirmed.*