McCURTAIN, et al, vs GRADY, et al.

Opinion delivered October 3, 1896.

1. *Discovery of Mineral—Rights Under Constitution of Choctaw Nation.*

A citizen of the Choctaw Nation, making a discovery of coal or other mineral, acquires the exclusive right, by virtue of Article 7, § 18, of the Constitution of the Choctaw Nation, to mine same in any direction within one mile from the point of discovery, or where he commences work, provided he does not interfere with the rights of prior settlers. And this right extends not only to the vein or lead on which the discovery is made, but to all of the coal or other mineral in the earth within one mile from the initial point of commencing work.

2. *Construction of Choctaw Constitution—Custom and Usage.*

The proper construction of article 7, § 18, of the Constitution of the Choctaw Nation being doubtful, the custom and usage of the Choctaw people in relation thereto may be shown, to arrive at the proper construction thereof.

3. *Master's Report—Exceptions.*

In order to review an order overruling exceptions to a master's report, it is not sufficient to except to the overruling of the exceptions as a whole, but appellant must ask for a separate decision and judgment upon each exception, and save his exceptions to the separate overruling of each exception.

4. *Grantor's Declarations.*

The declarations of a grantor, in his lifetime, while in possession of the premises about which he is talking, in disparagement of his title, are admissible as against his grantees, in actions by them against adverse claimants for possession.

5. *Irrelevant Testimony—Presumption.*

When irrelevant testimony is admitted by the Master in Chancery, and objection is made thereto, it will be presumed, on appeal, that in forming its decision the trial court, disregarded all incompetent testimony.

*6. Public Works in Choctaw Nation—Injunction.*

> The laws of the Choctaw Nation, (Stanley's Code, p. 103) pro-
> hibiting the Circuit Courts of the Choctaw Nation from issu-
> ing any injunction to stop public works does not prevent the
> United States Courts in the Indian Territory from issuing any
> such injunction.

Appeal from the United States Court for the Indian
Territory, Central District.

C. B. STUART, Judge.

Action by Green McCurtain and others against John
M. Grady, and others claimants to a part interest in coal
mines, adverse to plaintiffs and the Choctaw Coal & Railway
Company, lessee of its co-defendants, to recover possession
of mines, for an accounting, to enjoin lesses from paying
future royalties to its co-defendants, to cancel all leases con-
tracts or transfers of defendants, and to enjoin defendants
from interfering with plaintiffs' control of the property. A
decree was entered for defendants and plaintiffs appeal.
Affirmed.

This action was originally brought in the United
States Court sitting at South McAlester, in September,
1892. January 13, 1893, the plaintiffs below (appellants here)
filed an amended complaint, and dismissed their action as to
J. J. and Rebecca McAlester and G. M. Bond. The
amended complaint is found on pages 13 to 25 of transcript.
It alleges the residence and membership in the Choctaw
Nation of plaintiffs: that one of the individual defendants,
Grady, was not a member, either by blood or adoption, of
any Indian tribe; the incorporation of the railway company
defendant, and appointment of receivers for it, who are
made defendants, by the United States Court in the Indian
Territory, and that the subject of the action was a con-
troversy over mining rights and the invasion thereof, where

the amount exceeded $100; that about May 1, 1894, one Krebs, a member of the Choctaw Nation, and Phillips, one of the plaintiffs, jointly made discoveries of coal, the precise location of the points of discovery being given, and that by reason of such discoveries they became, under the constitution and laws of the Choctaw Nation, the absolute owners of all coal being within a radius of one mile in every direction from each one of said points of discovery, and that through sales and transfers change of ownership has taken place, until the plaintiffs in this action were the owners of the undivided five-eights of such coal claims, and the coal therein, and of all that had been mined upon and taken away therefrom. Alleges that the defendants who were sued personally, wrongfully assuming to own such coal claims, and to have the right to control and dispose of the same, had made such contracts or leases that the Choctaw Coal & Railway Company came into the possession of such claims, holding under defendants, and had opened and worked a coal mine on said discoveries or claims, and continued to mine and take coal therefrom, and that the railway company and its receivers had, at the commencement of the action, taken out 4,000,000 bushels of coal, of the value of $80,000, and for the plaintiff's five-eights thereof they had never received any compensation, but the defendants had been paid a royalty of one-fourth of 1 per cent. per bushel. Alleges that they are entitled to payment for five-eights of all the coal taken out at its value at the mouth of the mine, and, waving this right as against the railway company, and, as to it only, claim the payment of royalty from the date of the commencement of the action, and claim compensation as against the individual defendants for such value. The prayer asks that after the issues are made up the cause be referred to a master in chancery, "to take and hear proof upon all the issues of fact and to report thereon." Asks for orders upon the receiver to pay five-eights of all unpaid royalty, and of such

as might accrue, into the registry of the court, and for a restraining order to prevent payment of that part of the royalties to any of the individual defendants; and for a decree upon final hearing that plaintiffs were the owners of such undivided five-eights of said coal claims and the coal thereon, of the coal that had been taken therefrom, and the royalties thereon; and as against the individual defendants, a decree canceling all contracts, leases, or transfers, enjoining them from setting up any rights to the claims, the coal, or the royalties; and for a decree against them for the coal of which plaintiffs had been deprived, and for general relief. A demurrer to the amended complaint was filed, but never pressed, and never acted upon.

In the progress of the cause various steps were taken upon which no question arises herein, and the record in regard thereto need not be mentioned. A number of new parties defendant came in voluntarily, and the McAlesters and Bonds were, on their own motion, again made defendants to the action, and an amended answer was filed by all the defendants. This answer denies the discoveries alleged by plaintiffs to have been made by Krebs and Phillips, and denies their ownership in coal based upon such discoveries; alleges that the coal being mined by the receivers was discovered by James Anacher in 1857 or 1858, and marked in 1871 by the erection of a log cabin, and by blazing trees, and marking it as coal claim, and by making other improvements thereon, and a memorandum of the discovery in the county of the Nation, in which it was situated; that in about 1877 or 1878 the defendant John M. Grady discovered the coal in controversy, and prospected the same upon the belief that he was the original discoverer, and afterwards entered into a compromise with Anacher, who claimed a prior discovery, and by transfers the claim became the property of Anacher, Grady, Bond, and McAlester, and they August 1, 1889, leased it to the defendant railway company

that the right Anacher acquired "was a legal, absolute, and vested right forever to the said James Anacher, his heirs, executors, administrators, grantees, and assigns, to work said ·coal claim, and to work and operate all of the coal beneath the surface for a distance of one mile in every direction from the said place of discovery," and this right was conferred upon the railway company for the period of 99 years; that said railway company commenced under said lease, expended large sums of money, and has continued to operate the mine; alleges that in 1885 a compromise was made between Anacher and the owners of a claim immediately west of it known as the "Anolatubbee Claim," and marked the compromise, running north and south about 4,200 feet west of the discovery, near what is now Alderson slope (the alleged Grady discovery); and charges that all the work done by said company was done with knowledge of plaintiffs, and that no notice was ever given of the claim of plaintiffs, and pleads this as estoppel. The answer next sets out a discovery in 1871 by Martin Anolatubbee of an outcrop of coal west of the alleged Anacher discovery; alleges that it extended over and beyond the point of discovery of plaintiffs, and after death of said Martin Anolatubbee the guardian of the only heir executed a 99-year lease to the railway company, and subsequently a dispute arose between a son of Anacher, one Nail, and the heir of Anolatubbee, and they executed their lease to the railway company. The defendants then set up a discovery by one William Pusley to the west bank of Rock creek about 150 yards northwest of Rock Ford, alleging it was made about the year 1871 or 1872, and marked by the erection of a cabin and by digging coal, and that Pusley died, and his heirs now claim it, and have contracted with defendant company to work it; and that the discoveries claimed by plaintiffs, and the places where they are working, are within the limits of one mile of said Pusley's discoveries; and deny that

plaintiffs could have any right, title, or interest in or to the coal, or could have made a legal discovery where they claim to have made discoveries, and are trespassers, and have damaged defendants $10,000. The sixth paragraph of the answer sets up that Krebs went upon the premises in controversy, and established a farm claim, with the agreement between themselves and Anacher and Pusley that he was to establish a farm claim only, and have no right, title, or claim in the coal, and said Krebs established his residence with knowledge coal had been discovered on said premises, and was known to be the coal of said Anacher and Pusley; and that Krebs could not make a discovery of coal on these premises, and that he was estopped from ever asserting any such right. The seventh paragraph sets out that defendants were operating the coal mines through slope at Alderson long prior to the commencement of this action, and since the commencement thereof the plaintiff's have wrongfully commenced to sink a slope on the coal claim with a view to working their coal claim; that plaintiffs are tresspassers ; that defendants intend to work out all the coal upon the premises in controversy ; that they can do it cheaper and better than plaintiffs ; that the works of plaintiffs are insufficient; that their slope is being sunk in an improper and dangerous manner, and will result in great damage to the defendants, and asks that plaintiffs be restrained from further sinking their slope and from further work. The eighth paragraph sets up the claim that by reason of the compromise entered into between the plaintiffs and some of the original defendants, said defendants being pretended lessors to the railway company the railway company acquires the three-eights secured to those defendants by that compromise, and by reason thereof acquire the title to the five-eights claimed by the plaintiffs The said answer then sets up a suit brought in the Choctaw courts by Krebs, alleging it to have been brought for him

self and plaintiffs McCurtain, Ainsworth, and Phillips; that it was for the recovery of the same coal plaintiffs' claim in this action was settled and dismissed, and that such dismissal was an extinguishment of plaintiffs' rights. Defendants pray for an injunction against plaintiffs, and for a decree that they be found to have no right, title, claim, or interest either to ownership or possession in or to the coal claim in controversy, and that the railway company, its successors and assigns, be decreed to have the absolute, vested, prior, and superior legal rights to work said coal claim under its said leases, and for general relief.

To the amended answer a reply was filed, denying all the new matters therein that it was deemed material to make reply to. In reply to paragraph 3 of the amended answer, after denying the alleged discovery in 1871, by Anacher, of the coal in controversy, the plaintiffs aver that the point at which the defendants allege Anacher made a discovery is, in fact, about 3,000, instead of 1,000, feet from slope No. 1, and is entirely different and much smaller vein of coal than the vein of coal upon which the said Krebs and Philips discovery was made; that the two different veins and strata of coal outcrop from the earth at somewhere about 2,500 or 3,000 feet from each other, and extend down into the earth at about that distance from each other,—the larger vein, or what is generally known as the "Four-Foot Vein," being the one upon which the said Krebs and Philips discovery was made, and the one defendants are working, and lies in such relative position to the vein upon which it is claimed Anacher's discovery was made that the four-foot vein would be mined 2,500 or 3,000 feet under the earth before reaching a point perpendicularly beneath the outcrop of the thin vein. In reply to the fourth paragraph of the amended answer the plaintiffs say that the work at slope No. 1 was not begun by defendants upon the coal claim based on the Anacher

(10)

discovery, but was started by defendant Grady, through whom the company claim, and that at the very commencement of the work said Grady was warned by the plaintiffs not to do the work, and notified of the claim of plaintiffs; and that Grady, and the defendant railway company knew the fact that Krebs and plaintiffs were mining coal on the claim. In reply to the fifth paragraph of the amended answer the plaintiffs say that the Norman discovery was upon the small vein, and not upon the one on which the discovery under which plaintiffs claim was made and defendants are working; that the Anolatubbee claim is the same as the Wilson-Nail claim, and, if made at all, was upon the small vein, and at a point where it could not affect the discovery under which plaintiffs claim.

Plaintiffs, in their reply to the amended answer, plead the law of the Choctaw Nation forbidding the issuance of any order restraining the mining of coal.

The cause was referred by consent to Hon. Z. T. Waldron, as special master in chancery. January 8, 1895 the report of the special master was filed. February 20 1895, the plaintiffs filed their exceptions to the report of the special master. On May 16, 1895, the cause was submitted to the court upon the amended complaint, the exhibits thereto, the consolidated (amended) answer of the defendants and exhibits thereto, the reply of the plaintiffs to the consolidated (amended) answer of defendants, the report of the special master, the exception of the plaintiffs to said report, the motion of the defendants for injunction, the map filed, and all pleadings (the demurrer of the defendants to the complaint of the plaintiffs and the demurrers of the plaintiffs to paragraph 10 of defendants' answer being considered withdrawn) on file, and said cause is taken under advisement by the court. On July 10, 1895, the cause was finally decided by the court, and a decree entered. It was decreed that the exceptions to the report of the special

master filed by the plaintiffs be overruled, and the report of the special master in all things approved and confirmed, and the plaintiffs duly excepted both to the overruling and the exceptions and the approving and confirming of the report. It was then decreed that the plaintiffs had no right, title, or interest, either of ownership or possession, to the coal claims in controversy. Certain of the defendants were decreed to be the owners, and the railway company, as lessee, entitled to the exclusive possession of said coal claims and coal mines, and to operate same, and that the plaintiffs are estopped from claiming the coal in controversy known as the "Anacher Coal Claim," which is now worked and operated by said company through its slope No. 1. It was decreed that plaintiffs be perpetually enjoined from working or mining any coal on or from said coal claim, and from making any excavations thereon, and from interfering in any manner with the ownership and possession of the same by the defendants and their lessee. Plaintiffs were given 30 days after a final determination of the case to remove from the coal lands improvements, etc. Defendants were required to execute an injunction bond of $10,000. To all the rulings, decisions, and decree the plaintiffs then and there duly excepted, and these were noted of record. Plaintiffs prayed an appeal to the appellate court of the Indian Territory, and the same was allowed. It was ordered that upon plaintiffs' executing bond in 30 days in the sum of $20,000 the decree should remain superseded until the determination of the appeal. A further order was made upon plaintiffs as to manner of working, an improper entry in regard to which appears upon page 115 of transcript, as will be seen from entry on page 890 of transcript. The court, at the request of plaintiffs, placed upon file four specific findings as follows: "First. That under the Choctaw law the discovery of a vein of coal carries with it all coal within a radius of one mile from the point of discovery, and that, therefore, a

discovery on the Anacher vein would carry with it all coal within a radius of one mile from the point of discovery on that vein.   Second.   The court finds that Grady is a citizen of the Choctaw Nation, and was at the time of his claimed discovery.   Third.   The court finds the point of measurement of beginning on the William Pusley discovery was where the coal was first seen, about 150 yards north of what is known as 'Rock Ford.'   Fourth.   The court finds that the Choctaw law does not have the force or effect of preventing this court, in a proper case, like the one at bar, from issuing an injunction."

*Geo. B. Denison, N. B. Maxey, Thos. Marcum, S. S. Fears* and *A. H. and R. C. Garland*, for appellants.

1.   In the absence of a passing on each exception to a master's report, the deceree must show that there was a judgment on each exception specifically.   2 Danl.  Ch.  Pr. 1496, note 1; Lube Eq. Pl. 50, note 1; Story vs Livingston 13 Pet. 359; Oliver vs Piatt, 3 How. 333.

2.   The Appellate Court must pass upon the facts and law for itself in chancery cases, regardless of what the trial court did.   Wiscart vs D'Auchy, 3 Dall. 321; Gelston v Codwise, 1 Johns Ch. 189; Conway vs State, 13 Ark. 344 Ringgold vs Patterson, 15 Ark. 209; Woodruff vs Core, 2 Ark. 341; Spear Fed. Jud. 259–60.

3.   The claim of one discovering minerals attache only to the particular vein he discovers and works.   Iro Silver Mining Co. vs Cheesman, 116 U. S. 529.

4.   The court erred in granting an injunction again plaintiffs.   By its action it allowed a privilege to a no citizen which is denied a citizen.   The law makes no except tions and the court cannot do so.   Endl. Int. Stats. § 17 an notes, especially notes 78 and 79. United States vs Coombs 12 Pet. 72; Warfield vs Cox, 53 Penn. St. 382.

5. Custom and usage can be resorted to only when there is no law or the law is vague and uncertain. United States vs Buchannan, 8 How. 83; Clarke's Browne on Usage, pp. 8, 36, 146, 152.

6. Witnesses are not counted but weighed. The court must take all of the witnesses and consider their opportunity of knowing, their intelligence to learn and tell and their connection with the parties and the matter in conroversy. Stark. Ev. (Sharswood's Ed.) 832; Blackman vs Rose, 8 Wend. 105–109.

*J. W. McLoud, C. B. Stuart, W. J. Horton,* and *G. G. Randell;* for appellees.

1. A finding or report of a master will not be inerfered with, except when it is clearly and satisfactorily shown that the same is not in accordance with the law and the evidence. The findings of a referee upon the facts of a case are as conclusive as the verdict of a jury. Davis vs Allen, 3 N. Y. 168. The prevailing party is entitled to the most favorable construction of the findings of a referee to uphold the judgment. Waugh vs Seaboard Bank, 115 N. . 42; Hill vs Grant, 46 N. Y. 497.

2. Declarations of a person in possession of land as boundaries are competent evidence against him and those claiming under him. Mima Queen vs Hepburn, 7 Cranch 0; Boardman vs Reed, 6 Pet. 328; 1 Rice on Evidence, age 407, 408; Bartlett vs Emerson, 7 Gray 174; Daggart vs haw, 5 Met. 223; Long vs Colton, 116 Mass. 414.

3. Long practice may clear away ambiguities and ve a potent influence in the interpretation of a statute. utherland on Statutory Construction, § 137. If the words a statute be doubtful, general usage may explain it. *Ibid* § 308, 309.

*Rogers* and *Oglesby,* for appellees.

1.   The exceptions to the master's report came too late.   The statute requires the exceptions to be filed within four days after the filing of the report.   Mans. Dig. § 5271. Appellants should have required the master to state particulars of exceptions in his report.   The failure to do this and to follow it up and request specific rulings by the court as to the competency or admissibility of evidence operated as a waiver.   Mans. Dig. § 5269, et seqr.   By failing to have the court pass upon the exceptions to the evidence before trial appellants waived it.   Mans. Dig., § 2955, et seqr Johnson vs Meyer, 54 Ark. 439; Woodruff vs Core, 23 Ark. 341; St. L. & S. F. Ry. Co. vs Brown, 35 S. W. 224.

2.   No exceptions were taken in the court below to the failure of the court to pass specifically on the exceptions to the master's report.   The question not having been raised below, it cannot for the first time be raised here.   St. L. & I. M. Ry. Co. vs' Vincent, 36 Ark. 452; Johnson et al, vs West, 41 Ark. 535; Robinson vs Insurance Co., 51 Ark. 318 Crenshaw vs Bradley, 52 Ark. 318.   This court correct only such errors as are complained of in the court below Mills vs Jones and Read, 27 Ark. 506; Stewart vs Scott, 5 Ark. 159; Koch vs Kimberling, 55 Ark. 548; Eastman v Sims, 32 S. W. 539 and 855.

3.   In the trial of chancery cases, the Appellat Court does not try the case *de novo*.   It will reverse onl when the findings below are against the decided prepor derance of the evidence.   Chapman vs Liggett, 41 Ark 29 Tilgman vs Proctor, 125 U. S. 126; Kimberly vs Amis, 12 U. S. 512; Evans vs State Bank, 141 U. S. 107; Furrer Ferris, 145 U. S. 132; Warren vs Burt, 12 U. S. App. 591.

4.   An objection to the introduction of evidence mu be specific; otherwise the court may be entrapped into a ru ing it would readily have corrected.   Sexton vs Brosk, Ark. 345; Rogers vs State, 60 Ark. 88; Railway Company

Murphy, 60 Ark. 342; 18 U. S. App. 588; Blackburn vs Morton, 18 Ark. 392; Hurley vs State, 29 Ark. 17; Peel and Pelham vs Ringgold & Williams, 6 Ark. 550.

5. Long and continuous usuage furnishes a contemporaneous construction which must prevail over the mere technical import of the words. Rogers vs Goodwin, 2 Mass. 475; Baily vs Rolfe, 16 N. H. 252; Stuart vs Laird, 1 Cranch 279; Priggs vs Commonwealth, 16 Pet. 539; Cohen vs State, 6 Wheat. 264.

SPRINGER, C. J. (after stating the facts) The statement of the case is taken from the brief of counsel for the appellants. The pleadings and briefs of counsel have narrowed the principal issues in this case to a question upon the proper construction of a provision in the constitution of the Choctaw Nation, and to ascertain questions of fact. The report of the special master set forth 13 separate findings of facts, to most of which counsel for appellants filed exceptions. The exceptions were all overruled by the court below. The master also reported his conclusions upon the legal questions involved, to which counsel also excepted. The court confirmed the report, and gave judgment for appellees as set forth in the statement of the case.

The facts which are disputed are as follows:

1. As to the citizenship of John M. Grady, one of the defendants. While this is included in the findings of facts, it is more a question of law than of fact. The facts seem to be admitted. He claims to be a citizen of the Choctaw Nation by reason of his marriage to a white woman, who had theretofore married a Choctaw citizen by blood, who had died. She was an adopted citizen. But could she, by marrying a white man, confer citizenship in the tribe upon him? He was appointed guardian of his wife's minor child by her first husband by a Choctaw Court, and he had voted

at the elections in the Choctaw Nation, and had generally been regarded as a Choctaw citizen after his marriage. It is not necessary to pass upon Grady's citizenship in order to fully determine all the material questions in this case. The congress of the United States has authorized a commission to pass upon all questions of citizenship in the Indian Territory, with right of appeal to the United States Court, whose decisions shall be final. That commission is now in session, and it should not be embarrassed by any opinion of this court, unless absolutely necessary in order to determine the property rights of the parties to this suit.

2.   The master found, as a matter of fact, the customs and usages of the Choctaws in reference to acquiring a right to work a coal mine, to be as follows:   "Upon the question of the customs and usages prevailing among the Choctaws, in whose country these mines are located, I find the preponderance of evidence in this case to be that the discoverer or prospector of coal who follows up his preliminary work by stripping or mining coal or improving the surface near the initial point of his discovery, holds one mile from that point as a center, and is not confined to the particular vein or lead upon which his discovery is based. His franchise is the sole right to work coal within a circle two miles in diameter from the surface, down through different veins or leads of coal toward the center of the earth. This appears to be the rule which has existed in the Choctaw country. I do not claim that it is the law elsewhere." This finding of the master was excepted to by appellants, but was approved by the court. The finding is clearly sustained by a preponderence of the evidence.

3.   The findings of the master as to the facts of the respective discoveries of Isom Jefferson, of the Pusleys, known as the "Pusley-Norman Claim," of Anacher, and of Anolatubbee, as set forth in the report, or findings of fact

Nos. 6, 7, 8, 9, and 10, were based upon the testimony of a large number of witnesses. We have carefully examined the testimony in reference to these discoveries. It is true that there is some conflict, but the weight of evidence is overwhelmingly in support of the master's findings. In fact, there is no conflict in the testimony upon the question of the priority of these discoveries. Mr. Phillips, one of the appellants, stated in his testimony, in answer to the question as to whether Anacher set up any claim to the property in question, as follows: "No, sir. He always admitted it to be Krebs' property. Krebs got it from him." The appellants who claim through Krebs in nearly all particulars admit the priority of Anacher's discovery, but claim that Anacher gave the property to Krebs, or that Krebs got it from Anacher. The only disputed facts in reference to Anacher's discovery, is as to whether Anacher reserved the coal rights when he permitted Krebs to make improvements on the place, and open up a farm on it. The testimony of numerous witnesses on behalf of appellees is to the effect that Krebs never acquired from Anacher any right to the coal on the property which he discovered. The master so found, and the court below reached the same conclusion.

4. The master's findings of facts as to Krebs' claim is as follows: "The Krebs discovery or claim covers the Pusley-Norman, Anolatubbee, and Anacher-Grady claims. I have found the Norman-Pusley claim, which is based upon the McAlester thick lead or vein of coal, and which includes the Samples mine, as senior and superior to that of the Krebs-Phillips discovery. The other claims of defendant, except the Grady discovery, were based upon the thinner leads or veins. The initial point of the discovery made by Grady upon the McAlester vein appears to be at a point about one-fourth mile east of the mine at Alderson. The extent of his radius westward on this outcrop would be about three fourths mile west of the Alderson mine. I find

Grady to be first upon this vein. He maintained his discovery by improvements, and is, therefore, prior, senior, and superior to the plaintiffs. However, should it be held that he was not a citizen or a member of the Choctaw tribe, he would take nothing herein. As Judge Krebs had improvements outside of the Pusley-Norman claim, this would leave an area of about 300 feet of the McAlester coal between the two senior and superior discoveries to the plaintiffs, which would be theirs, if the law of the case be that the discoveries run by veins or leads." The master's conclusion, as above set forth as to John M. Grady's discoveries, is doubtless based upon a misapprehension as to the relations which existed between Grady and J. J. McAlester and James F. Freeny. Grady testified as follows: "Question. When you were prospecting there for coal in 1879, was anybody else, and other citizens of the Nation, interested with you in the coal discoveries or bearings? Answer. Yes. Question. Who? Answer. McAlester, in the first place, and then Freeny come up there in 1879, and we made arrangements to prospect together in partnership." McAlester and Freeny were Choctaw citizens. J. J. McAlester testified that he and Grady were discussing the coal question (this was evidently in 1879, the time to which Grady referred), and Grady said he thought he could find some coal that would be valuable to him (McAlester) and McAlester told him if he would find it he would make it interesting for him, and pay him well for it. This testimony seems to support the contention of the appellees' counsel that, if Grady were not a citizen, his discovery was made while working for, or in partnership with, McAlester, a Choctaw by marriage, and Freeny, a Choctaw by blood; and, if he could not hold, his discovery would inure to McAlester and Freeny, and would not be treated as no discovery. The findings of the master as to the facts of the case, in all particulars, seem to be abundantly supported by the evidence. The master also report-

ed to the court below his findings of the law governing coal discoveries in the Choctaw Nation. Article 7, § 18, of the constitution of the Choctaw Nation, contains all there is on the subject, and is as follows: "Any citizen of this Nation who may find any mine or mines or mineral waters, shall have exclusive right or privilege to work the same so long as he may choose within one mile in any direction from his works or improvements, provided, however, he does not interfere with the rights of the former settler." The master finds that there is no statute on the subject, and that the Choctaw Courts have never passed upon the question involved in this case. "The question," the master states, "as to whether the mile radius in any direction was confined to the particular vein discovered, or extended over a circular surface having the initial point as its center, and whose diameter was two miles, including the entire coal formation of the earth, has been squarely presented a number of times in the Indian Courts, but, unfortunately for us, the causes in which the question arose were settled by compromise, and no precedent obtained for our guidance." The constitutional provision is not free from doubt as to its meaning. A mine is not, strictly speaking, the subject of discovery. Webster's Dictionary defines a mine as follows: "A pit or excavation in the earth, from which metallic ores or other mineral substances are taken by digging." The word "mineral" was evidently intended, as it expresses the only meaning which can be given to the provision. Mineral is the subject of discovery. The mine is the pit or excavation which is made in order to discover the mineral, or after the discovery of an outcrop has been made. The words used in the section, "to work the same," evidently mean that the person who finds the mineral may extract it from the earth, may mine it. The person who finds coal may dig pits, make excavations, and carry on the business of mining coal, within the limits of one mile in any direction from his works or

improvements.   The discoverer actually finds, at the time of discovery, only the coal in sight.   If what he saw was all he had a right to take, his discovery would be worihless.   The provision evidently intended to give the discoverer the right to extract from the earth the kind of mineral which he discovered in every direction from the point of discovery, or

Minerals—
Rights of
Discoverer. from the place of erecting his improvements, for the distance of one mile.   The constitutional provision should be construed as if it read as follows:   "Any citizen of this Nation who may find any mineral or minerals or mineral waters shall have the exclusive right or privilege to extract such mineral from the earth, or to use the mineral waters, so long as he may choose, within one mile in any direction from his works or improvements: provided, however, he does not interfere with the rights of the former settler."   When the mineral is discovered, it cannot be known at the time what is the extent of the deposit, whether it be a vein or a "pocket," or what will be its quantity or quality.   Future developments alone will determine these questions.   For the purpose of inducing the discoverer to make excavations, to sink pits, to prospect for unseen deposits, the law gave him the exclusive right to carry on the busineęs of mining for that kind of mineral within a radius of one mile from the place where his works or improvements were first erected.   This construction is in accordance with the customs and usages of those who have been engaged in mining in the Choctaw Nation since coal was first discovered and mined in that Nation.   It is true that usage and custom cannot be made to override a statute whose meaning is clear and free from doubt.   But, where the meaning is doubtful, the statute

Usage and
Custom. should receive that construction which is supported by custom and usage, and by contemporary history and interpretation.   A   contemporary   exposition,   practiced and acquiesced in for a period of years, fixes the construction which should be given to a statute, and the courts will not

shape or control it.   Stuart vs Laird, 1 Cranch, 299.   As
was said by Chief Justice Marshall in Cohens vs Virginia,
6 Wheat. 264: "Great weight has always been attached,
and very rightly, to contemporaneous exposition."   It is
true, however, that the Choctaw constitution has not re-
ceived judicial exposition heretofore, but long and con-
tinuous usage furnishes a contemporaneous construction,
which must prevail over the mere technical import of the
words, or where the meaning is doubtful.   Rogers vs Good-
win, 2 Mass. 475; Bailey vs Rolfe, 16 N. H. 252.   Mr. Justice
Field, of the Supreme Court of the United States, in the
Eureka Case, 4 Sawy, 311, Fed. Cas. No. 4,548, referring to
the mining laws, the meaning of which he construed in that
case, said:   "These acts were not drawn by geologists or
for geologists.   They were not framed in the interest of
science, and consequently with scientific accuracy in the use
of terms.   They were framed for the protection of miners in
the claim which they had located and developed, and should
receive such construction as will carry out this purpose."
This language applies with peculiar force to the provision
of the Choctaw constitution in question in this case.   The
Choctaw constitution was not drawn by geologists or for
geologists, or in the interest of science, or with scientific ac-
curacy.   It was framed by plain people, who have agreed
among themselves what meaning should. be attached to it,
and the courts should give effect to that interpretation
which its framers intended it should have.   Any other con-
struction would be manifestly unjust.   The meaning which
we have given this provision is not only in accordance with
custom and usage, but it is in accordance with custom and
common sense.   In the very nature of things, it is the con-
struction which must prevail.   The construction contended
for by counsel for appellants would result in serious conflicts
and inextricable confusion.   The lines between different
claims could never be accurately known.   After a thin vein

had been worked for a time, it might be merged into, and be found to be a part of, a thicker vein, within the mile limit, which might be claimed by another and subsequent discoverer. The width of the vein at the point of discovery has nothing to do with the extent to which the discoverer may carry on the work of mining for coal. He has the exclusive right to mine coal within one mile in all directions from the point from which his works or improvements are erected. But the discoverer cannot change his limits by changing the place of his works. The first works or improvements he may erect will determine the limits of his claim. Subsequent works must be within his original limits. But within his original limits he has the exclusive right to mine for coal to any depths to which he may desire to make excavations, or to carry on the business of mining.

Counsel for appellants insist that the judgment of the court below should be reversed on the ground that the court did not pass upon the exceptions to the master's report separately, but overruled them as a whole, giving no judgment at all upon each one, The record shows that on July 10, 1895, the following order, among other orders, was made and entered of record, both parties being present by their solicitors: "That the exceptions to the report of the special master herein heretofore filed herein by the plaintiffs be, and the same are hereby, overruled, and that the said report of the special master is in all things approved and confirmed; to which ruling, decision, and decree of the court overruling said exceptions of the said plaintiffs, and approving and confirming the said report of the said special master, the plaintiffs then and there duly excepted, and asked that his [their] exceptions be noted of record, which is now done accordingly." This is all the record discloses on the subject. We are not disposed to place our conclusions upon the words "duly excepted," but we insist that the plaintiffs should then have asked for a separate decision and judgment upon each

exception, if they deemed it necessary or essential to the vindication of any of their rights in the premises. If it had been demanded, the court would have complied with the request, and would then have entered a separate decision upon each exception. As none of the substantial rights of the plaintiffs were affected or denied by the course which was pursued, this court will not reverse the judgment on that ground.

Master's Report— Exceptions.

Counsel for appellants contend that the master erred in allowing certain witnesses to testify to conversations in their lifetime with Anacher, Krebs, Pusley, and Anolatubbee, then deceased, upon the ground that such testimony was "the rankest hearsay." There may have been testimony admitted by the master, and incorporated in his report to the court, which was irrelevant and inadmissible. But it does not follow that the judgment of the court was based upon such testimony. The rule would be different if such testimony had been submitted to a jury, and the verdict of the jury had been based upon it. But the master merely reported the testimony to which there was an exception taken to the court. The court, in forming its judgment, is presumed to have disregarded all incompetent testimony. However, no error seems to have been made in the admission of the testimony as to declarations of Anacher, Krebs, Pusley, and Anolatubbee, made in their lifetime, while they were in possession of the premises about which they were talking. The admissions of Krebs against his interest are by all rules of evidence clearly admissible. The admissions by a grantor of land are relevant against his grantee, of a landlord against his tenant, of devisor against devisee, of any owner of land against those who subsequently derive title from or through him. Chadwick vs Fonner, 69 N. Y. 404; Simpson vs Dix, 131 Mass. 179; Pickering vs Reynolds, 119 Mass. 11. Not only those declarations by the owner of land or by one claiming title, which are in disparagement of his

Incompetent Testimony. Presumption.

Admissions— When Admissible.

title, are admissible against the declarant or persons in privity with him (see Bowen vs Chase. 98 U. S. 254,) but also those statements made by him while in possession, which show the character of his possession, and by what title he claims Pitts vs Wilder, 1 N. Y. 525; Moore vs Hamilton, 44 N. Y. 666; or, as some cases hold, to show the extent of occupation or boundary Abeel vs VanGelder, 36 N. Y. 513; Sheaffer vs Eakman, 56 Pa. St. 144. See, also Chapman vs Edmands, 3 Allen, 512. Such evidence comes properly under the doctrine of *res gestae.*  1 Greenl. Ev. § 109; Steph. Ev. (Am. Ed.) pp 41, 42, note. The testimony referred to was properly admitted by the master, and the court may, without error, have based its decision upon it.

Counsel for appellants also insist that the master erred in permitting Dr. Hailey and others to testify as to the customs and usages in the Choctaw Nation in reference to the extent of a coal claim. It is admissible to prove contemporaneous construction in this case, and no error was committed in permitting such testimony.

**Construction of Statue. Usage.**

Counsel for appellants insist that the court below erred in granting an injunction in favor of the coal company in the face of the following provision of the Choctaw laws: "Provided, however, that the Circuit Courts of said Nation shall not have power to issue writs of injunction or other process to stop the operation of any public works." See Stanley's Code, p. 103, near bottom of page. And also in view of article 43 of the treaty of 1866, wherein the United States especially agrees "not to prevent the legislative authority of the respective Nations from authorizing such works of internal improvement as they may deem essential to the welfare and prospsrity of the community." That "the Choctaw Coal & Railway Company entered into a contract with the national agent of the Choctaw Nation after the passage of the law prohibiting injunctions, above set

forth. That all the rights and privileges the coal company may have in the Choctaw Nation come by virtue of this contract with the national agent, and, if the coal company takes the rights and privileges of the Choctaw law, it must also abide by its prohibitions and estoppels or bars, or must take the burden with the benefits." This contention is urged by counsel with so much confidence and plausibility that we feel called upon to make special reference to it. It is within the undoubted power of the Choctaw council to create courts to enforce the laws of the Choctaw Nation, and to define and limit the jurisdiction of such courts. The Circuit Courts of the Nation are by the provisions indicated prohibited from issuing "writs of injunction. or other process to stop the operation of any public works." A fair and reasonable construction of this statute by a Choctaw Circuit Court would not prohibit it from enjoining A. from working B.'s mine if B. himself desired to work it. It would only prohibit the court from enjoining the working of the mine by any person or persons. The court was only prohibited from issuing any writ "to stop the operation of any public works," just as would abate a nuisance. We cannot presume for a moment that the Choctaw legislature intended to permit one of its citizens to appropriate the property of another, and deprive the courts of any power to prevent it. But, whatever construction of the Choctaw Courts may put upon the statute, it will not be seriously contended that the United States Court, created by the government of the United States, is limited in its jurisdiction by any provision of the Choctaw council. The treaties between the United States and the Choctaw Nation concede the right of the former to establish courts in the Indian Territory. The powers and jurisdiction of this court are prescribed by the laws enacted by congress. The jurisdiction of the Choctaw Court is expressly limited by treaty and by acts of congress to controversies in which citizens of the Indian Nation are "the

Choctaw
Laws.
Injunction.

(11)

sole parties to the controversy." The contention of counsel is one relating to jurisdiction solely. The jurisdiction of the United States Court has been conferred by congress, and can only be restrained, limited, or controlled by acts of congress. The right of congress to establish courts in the Indian Territory is not disputed. It is conceded by the respective Indian Nations in the treaties which they have made and ratified. And the right to establish courts carries with it the right to prescribe their jurisdiction, unless there is an express reservation. The laws of congress are in force in the Indian Territory as well as elsewhere in the United States. The national agent of the Choctaw Nation, and all contracts which he made with the coal companies in this case, were subject to the laws of congress, and the United States Court in the Indian Territory has the power to enforce those laws by the issuance of writs of injunction, and by all other processes which may be necessary for carrying its powers into effect.

Upon a careful examination of the record in this case and also of the briefs and arguments submitted by the learned counsel, on both sides, we are of the opinion that the judgment of the court should be affirmed.

We find in the judgment of the court the following among other, orders, namely : "And it is further ordered that the plaintiffs shall, every sixty days from this date make a report to this court, under oath, of the amount of all coal taken out of said mine, and sold, held, or shipped by the plaintiffs during the pendency of this appeal." And on page 310 of the record we find the following agreement "By agreement between the parties, the question as to the amount of coal and the value of it taken from the mine in question is deferred for subsequent investigation, if the court hereinafter deems it necessary to go into that question." For the purpose of enabling the court below

enforce the foregoing order, and to carry into effect the foregoing agreement between the parties, the case is remanded. As to all matters finally determined when the appeal was prayed, the judgment of the court below is affirmed.

KILGORE and LEWIS, JJ., concur.